1
2
3
4
5
6
7
8
9

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| W.H., a minor, By and Through his parents B.H. and K.H., | CASE NO. CV F 08-0374 LJO DLB |
| Plaintiff, | **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** (Docs. 47, 49, 50, 51) |
| vs. | |
| CLOVIS UNIFIED SCHOOL DISTRICT, | |
| Defendant. _____/ | |

### INTRODUCTION

Plaintiff W.H., by and through his parents B.H. and K.H. ("Student"), moves for summary judgment on his Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400 *et seq*., claim against defendant Clovis Unified School District ("District"). Student challenges a December 17, 2007 administrative decision that he is ineligible for special education and related services and that he was assessed in all areas of suspected disability. Student argues that procedural and substantive errors require this Court to overturn the decision of the administrative law judge. District cross-moved for summary judgment arguing that District properly assessed Student in his areas of need and provided Student with a free appropriate public education ("FAPE"), as required by the IDEA. For the following reasons, this Court GRANTS summary judgment in favor of Student and against District on the issues of written expression assessment and whether Student was eligible for special education under the category of "other health impaired." For all other issues, this Court GRANTS summary judgment in favor of District and against Student. This Court REMANDS this action for consideration of remedies.

1

# BACKGROUND[1]

## Factual History

Student was diagnosed with attention deficit hyperactivity disorder ("ADHD") in 2003.  After his diagnosis, Student entered Maple Creek Elementary School ("Maple Creek"), a District school, as a first grade student for the 2003-2004 school year.  Student repeated the first grade at Maple Creek during the 2004-2005 school year.  Based on the applicable statute of limitations, this action focuses on the time period between June 20, 2005 and June 20, 2007, corresponding to the end of Student's second first grade year through the end of his third grade year at Maple Creek.

Student is of average to above average intelligence.  According to District psychologist Ann Anderson ("Ms. Anderson"), Student has a full scale IQ of 102.  According to a report prepared by Dr. Glidden nine months later, Student had a full scale IQ of 117.  Student began second grade above grade level and was ranked as one of the top students in his class.  In the second and third grades, Student received A's and B's, or their equivalents, on his report cards.  On the 2006 and 2007 California Standardized Testing and Reporting ("STAR") exams, Student scored in the proficient range in language arts and advanced range in math.  Student's second grade teacher describes him as "very intelligent" and his third grade teacher characterizes him as a "smart kid."

Around October 2005, Student began to exhibit consistent and escalating behavior problems.  According to Lori Kuipers ("Ms. Kuipers"), Student's second grade teacher, Student hurt other children, by hitting, tripping, and throwing objects at them.  By all accounts, Student's second grade year in Ms. Kuipers' class was "horrible" and "crazy."  Between September 2005 and April 2006, Student received 24 conduct referrals–one during PE, one during library time, one in the lunch room, one during a field trip, two while standing in line, and 16 during class time.  Kathy Wandler ('Ms. Wandler"), District behavior analyst and education consultant, was asked to make implement a behavior plan to assist with Student's behavior.  Eventually, at the beginning of May 2006, Student was removed from Ms. Kuipers' class and was placed in different classroom to finish that school year.  Student adjusted well to the new classroom and did not display significant discipline problems through the end of that school year.  In his

---

[1]The Court takes these facts from the administrative record.  Disputed facts and facts relevant to a specific legal issue are presented and addressed below in the Discussion section.

third grade class with Gary Kliewer ("Mr. Kliewer"), Student again began to exhibit behavior problems. To address the issue, a behavior referral was made to Ms. Wandler. She observed Student in Mr. Kliewer's classroom for 30 hours between October and early December 2006. Ms. Wandler developed a behavior support plan ("BSP") for Student based on her observations , and presented that plan to an individualized education plan ("IEP) team on December 6, 2006. Student's parents initially rejected Ms. Wandler's plan, but after continued behaviorial issues, agreed to its implementation in February 2007. Ms. Wandler implemented the plan in the classroom from February through April 2007. After Ms. Wandler left, Student's aggressive behaviors returned.

Student also had difficulty with work completion, particularly with writing assignments. According to Stacey Linn ("Ms. Linn"), Student's second first grade teacher, Student refused to do his work, and would "freeze when writing." Ms. Linn testified that Student had difficulty with "stretching out" words and would not write unless he knew the exact spelling of a word. Ms. Linn reported that Student was inconsistent with work completion, and incentives helped Student to complete assignments. Ms. Wandler also observed Student had difficulty with "task initiation" in Ms. Linn's classroom. To address this issue, a "Section 504 plan" was developed. Student's Section 504 plan accommodated Student's work to require Student to complete 50% of the schoolwork assigned. At the beginning of the 2005-2006 school year, Student completed all of his work. In October 2005, however, Student's behavior and work completion issues escalated, and Student only completed roughly 50% of his accommodated work in class. His teacher, Ms. Kuipers, testified that Student refused to do his work, but when he wanted to write, he "probably" wrote at grade level. Student's third grade teacher, Mr. Kliewer, reported that it was difficult to keep Student on task, and that his work completion was about 50%. Student told Mr. Kliewer that he did not want to write and did not like to write. Mr. Kliewer testified that it was difficult for Student  "to write anything down on paper." As a result, Student did not turn in, and did not attempt to turn in, class writing assignments in Mr. Kliewer's class. Ms. Wandler observed that Student completed around 50% of his accommodated work, which resulted in around 25% total work completion. Ms. Bath observed Student to complete 20% of his accommodated work while in class.

During the relevant time period, District and Student's parents organized to have Student

3

assessed in a number of areas.  In January and February 2005, District psychologist, Ann Anderson ("Ms. Anderson") assessed Student in the areas of vision, fine motor skills, behavior, visual-motor integration, and social-emotional health.  In August 2005, Dawn Aholu ("Dr. Aholu"), occupational therapist at Children's Hospital of Central California, evaluated Student in vision motor control, upper limb dexterity, coordination.  In November 2005, Student's parents sought an assessment from Howard Glidden ("Dr. Glidden"), a private neuropsychologist.  Erin Dolin ("Ms. Dolin"), District occupational therapist, evaluated Student over two days in May 2006.  Terri Weigand ("Ms. Weigand"), District resource specialist, assessed Student when he was in first grade, and again in May and June 2006.  Sue Holmen ("Ms. Holmen"), District nurse, performed a health and development assessment on Student in February 2005 and updated her assessment on May 26, 2006.  Robert Patterson ("Dr. Patterson"), a psychologist arranged by Student's parents, evaluated Student on August 25, 2007.  Dr. Aholu re-assessed Student in September 2007.  In addition to ADHD, Dr. Glidden diagnosed Student with a developmental coordination disorder.  Dr. Patterson diagnosed Student with ADHD with a psychological processing disorder, a speed processing disorder, and an oppositional disorder.

District and Student's parents met on several occasions to address Student's behavior and work completion problems, and to consider whether Student was eligible for special education and related services.  Prior to the relevant time period, on September 9, 2004, Ms. Anderson, District psychologist, referred Student to special education at a student study team meeting.  In January 2005, a special education assessment plan was developed, with January and February 2005 assessments.  On February 22, 2005, an IEP team met and District determined that Student was ineligible for special education. District convened a section 504 meeting in February 2006 to address Student's continuing challenges. District psychologist Ms. Bath was sufficiently concerned about Student's escalating and aggressive behavior and class work completion problems, as discussed at the February 2006 meeting that she called Student's mother to suggest that Student might qualify for special education under the category of emotional disturbance.  Student's mother was upset with that diagnosis and denied that Student had an emotional disturbance.  An assessment plan was developed for Student in April 2006 and Student was assessed in May and June 2006.  An IEP team meeting convened in June 2006 and, after reviewing the assessments, District determined that Student was ineligible for special education and related services.

4

During the initial months of the 2006-2007 school year, Student continued to experience the same problems. Due to parent's concerns that Student was eligible for special education as a result of his ADHD, District agreed to prepare an update to its May 2006 assessment on October 19, 2006. District completed its addendum to the May 2006 assessment on December 6, 2006. On that day, District held another IEP meeting after determined that Student was ineligible for special education and related services. A Section 504 meeting was convened on February 16, 2007 and Student's parents consented to Ms. Wandler's BSP. No further IEP meetings convened during the relevant time period.

**Procedural History**

To challenge Student's ineligibility determination, Student filed a due process complaint on June 20, 2007. Administrative Law Judge Debra Huston ("ALJ"), Office of Administrative Hearings, Special Education Division, hearing this matter in Clovis, California on October 15 through 19, 2007. The ALJ issued her decision on December 17, 2007 in the matter of *Student v. Clovis Unified School District*, OAH Case No. N2007060634 ("Decision"). In her Decision, the ALJ found that District assessed Student in all areas of concern. The ALJ further found that even if Student qualified as a Student with a special learning disorder ("SLD") or other health impairment ("OHI"), Student did not require special education and related services that could not be provided with modification of the regular program. Accordingly, the ALJ denied in full Student's requested relief.

Student initiated this action on March 14, 2008 to appeal the ALJ's Decision. This Court has jurisdiction to hear this appeal pursuant to 20 U.S.C. §1415. Student filed an amended complaint on April 2, 2008. The parties amended the administrative record, Student moved to expand the administrative record, and the administrative record was lodged with this Court. Pursuant to a January 27, 2009 scheduling order, the parties filed cross motions for summary judgment on April 27, 2009, oppositions on May 18, 2009, and replies on May 28, 2009. This Court vacated the June 10, 2009 hearing, pursuant to Local Rule 78-230(h), considered the parties' arguments, the amended administrative record, and the declarations and documents subject to judicial notice submitted, and issues the following order.

///

///

1

**STATUTORY FRAMEWORK**

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education." *Hoeft v. Tuscon Unified Sch. Dist.*, 967 F.2d 1298, 1300 (1992) (citing *Honig v. Doe*, 484 U.S. 305, 310 (1988)). The IDEA ensures that "all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. §1400(d)(1)(A). According to the IDEA, a FAPE is

> special education and services that–(A) have been provided at public expense, under
> public supervision and direction, and without charge; (B) meet the school standards of
> the State educational agency; (C) include an appropriate preschool, elementary school,
> or secondary school education in the State involved; and (D) are provided in conformity
> with the individualized education program required under section 1414(d) of this title.

20 U.S.C. §1401(9). To provide a FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education and services, conduct and implement an individualized education program ("IEP"), and determine an appropriate educational placement of the student. 20 U.S.C. §1414. More than a "simple funding statute," the IDEA "confers upon disabled students an enforceable substantive right to public education in participating States, and conditions federal financial assistance upon a State's compliance with the substantive and procedural goals of the Act." *Honig v. Doe*, 484 US. 305, 310 (1988).

Pursuant to the IDEA and the California Education Code, a "child with a disability" includes a child with "other health impairments, or specific learning disabilities; and who, by reason thereof, needs special education and related services," and whose impairment requires instruction, services, or both, that cannot be provided with modification of the regular school program." 20 U.S.C. §§1401(3)(A)(i), (ii); Cal. Ed. Code §§56026(a), (b). The IDEA defines special education as specially designed instruction, at no cost to parents, to meet the unique needs of the student. 20 U.S.C. §1401(29). Related services, pursuant to the IDEA, are "transportation and other developmental, corrective, and supportive services as may be required to assist the child to benefit from special education." 20 U.S.C. §1401(26). California law defines special education as "specially designed instruction designed to meet the unique needs of individuals with exceptional needs coupled with related services as needed to enable the student to benefit fully from instruction." Cal. Ed. Code §56031. Related Services, in California, refers to

6

designated instruction and services that must be provided if they may be required to assist the child to benefit from special education. Cal. Ed. Code §§56031, 56363(a).

### "Child Find"

Student contends that District violated its "child find" obligation, by failing to assess Student in his areas of suspected education and identify Student as one in need of special education and related services.  The IDEA and California state law impose upon each school district the duty actively and systematically to identify, locate, and assess all children with disabilities or exceptional needs who are in need of special education and related services. 20 U.S.C. §1412(a)(3); 34 C.F.R. §300.111(a)(1)(ii); Cal. Ed. Code §§56300, 56301.[2]  The federal and state statutory obligations of a school district to identify, locate, and assess children with disabilities is often referred to as the "child find" obligation.  District's child find obligation  applies to all children who are suspected of having a disability in need of special education, even though they may be advancing from grade level to grade level. 34 C.F.R. §300.111(c)(1). A district's child find obligation toward a specific student is triggered when there is a reason to suspect a disability and that special education services may be needed to address that disability. *Dept of Educ. v. Cari Rae S.*, 158 F.Supp.2d 1190, 1194 (D. Haw. 2001).

### Assessment , Evaluation, and Eligibility Determination

According to the IDEA and California's Education Code, each student must be assessed in all areas of his or her suspected disability. 20 U.S.C. §1414(b)(3); Cal. Educ. Code §56320(f).  The IDEA requires District to use a "variety of assessment tools and strategies" to "gather relevant functional and developmental information about the child." 34 C.F.R. §300.532.   This information includes examinations properly administered and information from the child's parent.  "No single procedure is used as the sole criterion for determinating whether a child is a child with a disability and for determining an appropriate educational program for the child. 34 C.F.R. §300.532(f).  To determine eligibility, District shall review "existing evaluation data," including evaluations provided by the parent

---

[2]Under the IDEA, participating states must implement policies and procedures such that "all children residing in the State who are disabled, regardless of the severity of their disability, and who are in need of special education and related services, are identified, located, and evaluated." 20 U.S.C. §1412(2)(C); *see also* 20 U.S.C. §1415(a).  California has implemented the substantive and procedural requirements of the IDEA through the California Education Code.  See Cal. Educ. Code §56500 et seq.

of the child; current classroom-based assessments and observations; and observations by teachers and related service providers." 34 C.F.R. §300.533(a).  "[O]n the basis of that review, and input from the child's parents," District then determines "whether the child has a particular category of disability." *Id*.

**Section 504**

Section 504 of the Rehabilitation Act of 1973 is a general civil rights provision "to prevent discrimination against all handicapped individuals." *Alexopulos v. San Francisco Uni. Sch. Dist.*, 817 F.2d 551, 554 (9th Cir. 1987); *see also,* 29 U.S.C.S. §794.  Section 504 provides: "No otherwise qualified individual with a disability...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. §794(a).  Section 504 applies to all public schools that receive federal financial assistance. *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008) (referencing 29 U.S.C. §794(b)(2)(B)).

While Section 504 does not require a FAPE or procedural safeguards in an educational setting, its implementing regulations do.  *See* 34 C.F.R. §§104.1-104.61.  34 C.F.R. §104.33 requires recipients of federal funds to "provide a free appropriate public education [FAPE] to each qualified handicapped person." 34 C.F.R. §104.33(a).  The U.S. DOE regulations define an "appropriate education" as:

> regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of [34 C.F.R.] §§104.34, 104.35, and 104.36.

The cross-referenced U.S. DOE regulations impose requirements similar to the IDEA with respect to identification, evaluation and placement of disabled students.  *Compare* 34 C.F.R. §§104.32-.35 *with* 20 U.S.C. §§1415(b)(6) and (k).  Under Section 504 regulations, elementary schools must evaluate the student and ensure proper placement.  Additionally, the U.S. DOE regulations require recipients of federal funding that operate public schools to establish and implement:

> a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure.  Compliance with the procedural safeguards of section 615 of the [IDEA] is one means of meeting this requirement.

34 C.F.R. §104.36.

1  Section 504 protects Student if he or she has a physical or mental impairment that substantially limits

2  one or more of life activities, or if he or she has a record of or is regarded as having such an impairment.

3  29 U.S.C. §794; 34 C.F.R. §104.3(j).

4  **ADHD, IDEA and Section 504**

5      ADD is not recognized explicitly as an educational disability under the IDEA.  In 1990, the

6  United States House of Representatives proposed to amend the IDEA to add "attention deficit disorder"

7  as a recognized educational disability under the definition of "other health impaired." H.Rep. No. 1013,

8  1013, 101st Cong., 2d Sess., 101(a) (1990).  The United States Senate, however, did not include ADD

9  specifically, because it interpreted "specific learning disability" to include ADD.  Committee of Labor

10  and Human Resources, S. Rep. No. 204, 101st Cong. 1st Sess., Sec. 9 (1989).  The United States

11  Department of Education ("DOE") subsequently issued a memorandum addressing the issue of proper

12  service for children with ADD. DOE Policy Memorandum, 18 IDELR 116 (1991). In it, the DOE

13  concluded that a separate disability category under the IDEA is unnecessary since children with ADD

14  who require special education and related services can meet eligibility criteria for services within the

15  "other health impaired" category. *Id*., referring to 20 U.S.C. §1401(a)(1).  DOE Office of Special

16  Education Programs also stated that "children with ADD could be eligible for services under the specific

17  learning disability category if they satisfy the criteria for that category." OSEP Policy Letter, 20 IDELR

18  73 (1993).

19      California state law special education eligibility is consistent with IDEA for a Student with ADD.

20  Pursuant to Cal. Ed. Code 56339, a student is entitled to special education and related services if their

21  educational performance is adversely affected by a suspected or diagnosed ADD or ADHD, and he or

22  she demonstrates a need for special education and related services by meeting the eligibility

23  requirements as an OHI, SLD, or serious emotional disturbance.

24      A child's ADD diagnosis alone, however, cannot establish the basis for a student's eligibility for

25  special education pursuant to the IDEA. *See, Sanders v. DeKalb County Central Unif. Sch. Dist.*, 26

26  IDELR 257 (N.D. Ind. 1996) (mere symptoms of ADD are not enough to require referral under IDEA,

27  especially when student's behavior could have been caused by other, unrelated factors).  By definition,

28  the IDEA only applies to children with disabilities *who require special education and related services*.

1    20 U.S.C. §1401(3)(B) (emphasis added).

2        Students with ADD who are not eligible for special education and services under the IDEA may

3    nonetheless be eligible for services under Section 504. OSEP/OCR Policy Letter, 21 IDELR 73 (1994).

4                                    ### STANDARD OF REVIEW

5        "When a party challenges the outcome of an IDEA due process hearing, the reviewing court

6    receives the administrative record, hears any additional evidence, and 'bas[es] its decision on the

7    preponderance of the evidence.'" *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (2007)

8    (quoting 20 U.S.C. §1415(i)(2)(B)). Based on this standard, "complete de novo review of the

9    administrative proceeding is inappropriate." *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (2007).

10   As the party seeking relief in this Court, Student bears the burden of demonstrating that the ALJ's

11   decision should be reversed. *Clyde K. V. Pullayup Sch. Dist., No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994).

12   In addition, the party challenging the administrative decision bears the burden of persuasion on each

13   claim challenged. *Id.*

14       In review of an IDEA due process hearing, courts give "less deference than is conventional" in

15   review of other agency actions." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993).

16   "How *much* deference to give state educational agencies, however, is a matter for the discretion of the

17   courts." *Gregory K. V. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987).  The Court, "in

18   recognition of the expertise of the administrative agency, must consider the findings carefully and

19   endeavor to respond to the hearing officer's resolution of each material issue.  After consideration, the

20   court is free to accept or reject the findings in part or in whole."  *Id.*; *Ojai Unified Sch. Dist. v. Jackson*,

21   4 F.3d 1467 (9th Cir. 1993).

22                                    ### DISCUSSION & ANALYSIS

23                                     ### Procedural Issues

24   **1.    Consideration of Student's Motion for Summary Judgment**

25       This Court ordered each party to file its motion for summary judgment no later than April 27,

26   2009.  On that day, District timely filed its motion for summary judgment and separate statement of

27   facts.  Student filed an incomplete motion for summary judgment on April 27, 2009, an untimely

28   amended points and authorities on April 28, 2009, and an untimely "revised" motion for summary

                                            10

judgment on April 29, 2009.  On April 30, 2009, this Court, by minute order, directed Student to cease filing amended orders and to indicate which document was Student's motion.  On the same day, Student's counsel filed a statement indicating that the revised motion, filed on April 29, 2009, was Student's motion for summary judgment.

In its opposition to Student's motion for summary judgment, filed on May 18, 2009, District points out the many flaws in each of Student's memoranda, including the untimely filing, failure to cite to the administrative record, and failure to include a table of authorities or a table of contents.  District requests that this Court refuse to consider any version of Student's motion for summary judgment in this matter, for failure to file a timely memorandum that was in compliance with this Court's local rules. In addition, District argues that Student's separate statement of facts are immaterial and should be stricken.  District did not respond to Student's separate statement of facts.

In reply, Student contends that "due to misfortune, the wrong document was inadvertently sent." Student seeks relief from mistake and excusable neglect, erroneously relying on Fed. R. Civ. P. 60. Student argues that no prejudice occurred as the length of delay was minimal.  Student points out that District's failure to respond to Student's separate statement of facts violated a local rule and therefore has unclean hands.

This Court has the discretion to refuse to consider moving papers that are not timely submitted in violation of this Court's order, and the failure to comply with the Court's orders, local rules and the Federal Rules of Civil Procedure "may be grounds for the imposition by the court of any and all sanctions...within the inherent power of the Court." Local Rule 11-110.  Having considered the parties arguments, this Court denies District's request to ignore Student's motion for summary judgment and separate statement of facts.  Student's memorandum in support of his summary judgment was untimely and violated this Court's local rules.[3] Nevertheless, District fails to argue that the untimely memorandum caused District prejudice and, because District responded to Student's motion, demonstrates no prejudice

---

[3]This Court previously considered a motion to strike a motion for summary judgment based on Student's counsel's failure to file a memorandum in a timely manner and in accordance with this Court's local rules.  This Court admonishes Student's counsel that future failure to file documents in a timely manner and in accordance with the local rules will not be met with leniency.  Student's counsel's past and current excuse, amounting to a failure to operate a personal computer competently, does not demonstrate good cause for failure to follow local rules and this Court's orders.

in the untimely and lacking memorandum.  Moreover, District violated this Court's local rules by failing to respond to Student's separate statement of facts.  If District was unclear about this Court's order or local rules, District should have sought clarification.  District's refusal to respond to Student's separate statement of facts was erroneous and presumptuous.  By balancing the equities, and in this Court's discretion, this Court will consider Student's revised amended memorandum in support of his summary judgment motion and Student's statement of facts.

**2.      Motion to Consider Additional Evidence**

Student previously moved to expand the administrative record to include a declaration by Dr. Patterson, Student's expert witness.  Student sought to introduce a supplemental declaration of Dr. Patterson as to the "interpretation of his assessment, testing instruments, and medication issues."  Student notes that he was unable to recall Dr. Patterson in rebuttal due to the ALJ's time restrictions.  Student seeks to elicit Dr. Patterson's rebuttal declaration to respond to District's expert, Dr. Clare.  This Court ruled that it could not determine at that time whether the administrative record should be supplemented with the proposed Dr. Patterson declaration.  Order on Plaintiff's Motion to Expand the Administrative Record, p. 8.

Having considered the parties' arguments and the administrative record, and in light of this Court's interest in considering all evidence relevant to this decision, as well as the express statutory language in 20 U.S.C. §1415(e)(2), Student's motion for leave to submit Dr. Patterson's additional report is granted.  This Court shall consider Dr. Patterson's additional report in the instant decision.

**3.      ALJ Impartiality**

Student contends that the ALJ committed procedural error by failing to provide an impartial due process hearing.  Student argues that the ALJ was impartial because: (1) the ALJ imposed "inequitable and inappropriate time constraints" on Student; (2) the ALJ was inconsistent in her rulings on attorney objections; (3) the ALJ had ex parte communications; (4) the ALJ failed to clarify whether witnesses were adverse; (5) the ALJ ruled that Student was precluded to call Dr. Patterson to rebut Dr. Clare's testimony; and (6) the ALJ disallowed Student to elicit testimony regarding Student's Section 504 plan, but considered the 504 plan in her decision based on evidence presented by District.  The Court considers each argument below.

**a.     Time Constraints and Inconsistent Rulings**

The ALJ did not place inequitable and inappropriate time constraints on Student in the presentation of witnesses.  For every witness called by Student, Student used nearly twice the estimated amount of time for direct examination, as the ALJ noted in the record.  Although the ALJ became impatient with Student's counsel and her extended examination of her witnesses, the ALJ allowed Student an equitable amount of time to present his case, as demonstrated in the administrative record.

The ALJ consistently ruled on objections.  The ALJ admonished Student that she could not give as much weight to evidence elicited through leading questions of witnesses, adverse or not.  AR 1047-48.  The ALJ made clear, however, that the District would be held to the same standard as Student.  AR 1084.  Student incorrectly argues that the ALJ's inconsistent rulings lead to "extended and pervasive argument during the hearing...[which] led to loss of time allotted to [Student's] case."  Student's counsel, on a number of occasions, argued extensively with the ALJ's ruling on an objection.  Student's counsel refused to comply with simple rulings of the ALJ related to questions of foundation, and continually and consistently repeated the behavior sustained on objection.  Rather than comply with the meritorious objections, Student's counsel argued erroneously, and at great length, that she had complied with the ruling.  As the ALJ explained on the record:

> Excuse me, [District's attorney] has remained quiet for most of your examination of this witness, and has given you the opportunity to elicit questions, and as far as I'm concerned her objections have been meritorious, the ones she has interposed.  And as far as clear bias on my part I have been more than generous in allowing you to go over your estimate with each witness to ensure that the parents have the opportunity to put on their case.  I'm asking you–and I have very carefully laid out what I need, the manner in which I need to have you examine the witness.  And, for example, the most recent question I had a problem with where you asked the witness 'is everything in this document correct,' that's just not a proper way to get it in evidence, and its not helpful to your clients because there's not a way that I can give evidence much weight when the questioning is done in that manner.  So counsel, I have attempted [to] help you along the way in getting your questions to the witnesses properly in order to elicit evidence that I'm able to use. AR 1636:4-23.

Moreover, administrative hearing time was further expended to discuss Student's counsel's unprofessional behavior, including but not limited to, rolling her eyes at a ruling, interjecting comments while a witness testified, and objecting without legal and/or meritorious grounds.  In addition, time was spent to consider Student's counsel's attacks on the ALJ and opposing counsel.  Accordingly, it was Student's counsel, and not the ALJ, that caused a loss of time allotted.  The ALJ was equitable and

consistent in her time allotment and displayed no bias in her rulings on objections.

### b. Ex Parte Communications

Student asserts that while on break in the administrative hearing, the ALJ and District's counsel were found alone in the hearing room discussing presentation of witnesses. Student also contends that the ALJ discussed with one the of the witnesses her background and experience as an occupational therapist assessor off the record and during a break. A review of the record demonstrates that the ALJ stated on the record that she communicated with Student's mother during a break. Of this ex parte communication, the ALJ explained that Student's mother approached the ALJ to allege that the District witness then testifying spoke with a fellow District employee while the hearing was in recess.

Section 3084 of Title 5 of the California Code of Regulations provides in pertinent part:

> While special education due process hearing proceedings are pending, there shall be no communication, direct or indirect, regarding any issue in the proceeding, to a hearing officer from an employee or representative of a party or from any interested person unless the communication is made on the record at the hearing...If a hearing officer receives a communication in violation of this section, the hearing officer shall disclose the content of the communication on the record and give the parties an opportunity to address the matter if so requested within 10 days of receipt of notification of the communication.

Pursuant to this provision, the hearing officer explained the nature of the ex parte communications on the record. Student fails to allege that any ex parte communications were not addressed on the record, fails to explain why such communications were not raised by Student during the administrative hearing, and fails to show that he raised concerns regarding ex parte communications within 10 days of notification of the communication. Thus, Student failed to exhaust the administrative procedures regarding ex parte communications. Additionally, Student fails to explain how these communications demonstrate bias. It appears that any communications with District witnesses or counsel were de minimum in nature and without substance to the issues in the proceeding. Moreover, Student's mother also spoke with the ALJ off the record. Student does not address how this communication demonstrates bias against Student. Accordingly, any error through ex parte communications was harmless.

### c. Dr. Patterson's Rebuttal Testimony

Student argues that the ALJ demonstrated bias and impartiality, and violated Student's due process right to have his case heard fully, by precluding rebuttal testimony of his expert witness, Dr. Patterson. This Court has considered this issue in its Order on Plaintiff's Motion to Expand the

14

Administrative Record (Doc. 34).  Student argues that the ALJ unfairly adhered to a strict schedule that precluded Student from calling witnesses and to present his case fully.  Student has a right to be heard; however, a review of the record demonstrates that Student did not ask to recall Dr. Patterson as a witness.  Further, while the ALJ did end the administrative hearing on October 19, 2007 at 10 p.m., and allowed no further witnesses or questions that day, the ALJ gave Student's counsel the opportunity to reopen the case and scheduled an additional hearing day on November 5, 2007.  After the hearing, Student's counsel failed to indicate that an additional hearing day was necessary and the November 5, 2007 hearing date was vacated.  Student moved to re-open on different grounds, which was denied.  Thus, the ALJ was used her discretion to control the proceedings without denying Student due process.

Although the ALJ has discretion to control the proceedings, Dr. Patterson's testimony related to the effects of medication on Student was relevant to this action.  The relevance of that evidence was demonstrated particularly in that the ALJ relied heavily on Dr. Clare's testimony related to the effects of the medication on Student.  Accordingly, this Court will consider the rebuttal testimony of Dr. Patterson to rebut Dr. Clare's testimony regarding the effects of the medication on Student.

### d.    Characterization of Witnesses

Student asserts that it was judicial error and "instrumental in a denial of his Due Process rights," that the ALJ did not clarify the characterization of each witness as adverse or non-adverse.  The issue of how to handle witnesses was raised early in the proceeding, as the majority of the witnesses called by Student were District employees.  District's counsel expressed frustration because it was an unfamiliar situation that District witnesses were called on direct examination by Student.  District was thus required to cross-examine its own witnesses, but was unable to ask leading questions on cross-examination because those witnesses were not adverse.  Conversely, Student was allowed to ask some leading questions to its witnesses on direct examination, because some of the District witnesses were adverse.  Student complains that the ALJ should have clarified the characterization of each witness as adverse or not, and should have ascertained the extent to which District counsel was allowed to ask leading questions to District employees.

In review of the administrative proceedings, this Court finds that the ALJ clarified the characterization of each witness and answered questions related to the extent to which District counsel

was allowed to ask leading questions.  A blanket characterization was impossible, as some witnesses, while employed by the District, were not adverse to Student.  The issue as it pertained to each witness, was clarified when raised.  As discussed above, however, Student's counsel's refusal to ask foundational questions and to follow the ALJ's rulings led to an enormous loss of time for Student's case.  No substantial time was wasted in clarifying how each counsel was to question each witness based on adversity.

### e.   Consideration of Section 504 Plan

Student argues that the ALJ displayed bias, because she considered that Student was on a Section 504 plan without allowing Student to present evidence on that subject.  Student points out that the ALJ precluded Student from eliciting testimony on the Section 504 more than once, because, as the ALJ explained, the ALJ is without jurisdiction to consider Section 504 plans.  Nevertheless, the ALJ found that Student was able to access education by considering evidence of the effect of the Section 504 plans, as presented by District.  This Court agrees that the ALJ erred to preclude Student's questions related to the effects of the 504 plan on Student.  Although without jurisdiction to consider whether Section 504 provides Student a FAPE, the effects of the Section 504 plan was relevant to whether Student was able to access education without special education and related services, as discussed and relied upon by the ALJ in her Decision.

Nevertheless, Student's argument does not assert facts related to bias as a procedural error.  The ALJ's decision to preclude Student's testimony was based on her limited jurisdiction.  Student objections are directed more appropriately to the ALJ's weight of the evidence and conclusions.  Accordingly, this Court gives less deference to the ALJ's findings of fact and conclusions of law based on this error.

### 4.   Reformulation of Issues

The issues as stated by Student and as set forth in the ALJ's Pre-hearing Conference Order were as follows:

> 1.   Did the District violate its child find obligation by failing to identify Student as eligible for special education and related services under the categories of Other Health Impaired or Specific Learning Disability, or both from June 2005 through June 20, 2007?
>
> 2.   Did District fail to assess Student in all areas of suspected disability from June 2005 through June 20, 2007?  Specifically, Student contends that District failed

1    to assess him in the areas of writing, visual-motor integration, working memory,
2    social/emotional, and behavioral.

3  In her Decision, the ALJ presented the issues as follows:

4      1.    Did District have a child find obligation to assess Student in areas of suspected
             disability, including visual-motor integration, writing, working memory,
5            social/emotional functioning, and behavior, from June 20, 2005 through June 20,
             2007?
6
       2.    Did District fail to assess Student in areas of suspected disability, including
7            visual-motor integration, writing, working memory, social/emotional functioning,
             and behavior, as part of its May/June 2006 assessment?
8
       3.    Did District deny Student a free appropriate public education by failing to find
9            him eligible for special education and related services under the category of
             specific learning disability (SLD) or other health impairment (OHI) from June 20,
10           2005, through June 20, 2007?

11  The ALJ noted that although the pre-hearing order "stated the issues as two, rather than three, the issues

12  have been reformulated, without changing their substance, for purposes of organizing this Decision."

13  In his motion for summary judgment, Student raises the issue that the ALJ reformatted the issues

14  presented, but does not articulate how the ALJ's reformulation affected the substance of his arguments.

15  Specifically, Student argues:

16      Although the ALJ reformatted and reorganized the issues, her findings and legal
        conclusions ignore most of the relevant and significant evidence material to the basic
17      issues in the case, which includes [Student's] eligibility as a child with a disability who
        needs special education and related services, and the District's failure to acknowledge
18      and appropriately assess his disability and areas of need.

19  Thus, Student does not claim that the ALJ's reformulation of the issues prevented full consideration of

20  the issues Student presented.  Rather, Student's statement merely attacks the ALJ's findings of fact and

21  conclusions of law.  Similarly, in opposition to District's motion for summary judgment, Student writes:

22  'The ALJ rephrased the issues from her previous order. (citation) Contrary to Defendant's statement that

23  the issues were the same as agreed to by the parties (citation), the issues discussed and ordered by the

24  ALJ in her August 2, 2007, pre-conference order (citation), included: (quotation of issues above)."

25  Again, Student fails to articulate whether the ALJ's reformulation of the issues was error.  Accordingly,

26  based on the absence of argument on this issue, this Court finds that reorganization of the issues by the

27  ALJ was not erroneous.

28  **5.    Deference to the ALJ's Analysis**

17

Before discussing the merits of Student's IDEA procedural and substantive violations arguments, this Court addresses Student's position regarding the degree of deference this Court should give to the ALJ decision. *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942-43 (9th Cir. 2007). Student argues that this Court should not defer to the ALJ's findings of fact and conclusions of law. District contends that this Court should afford substantial deference to the ALJ's thoughtful and careful decision.

"[T]he amount of deference afforded the hearing officer's findings increases where they are thorough and careful." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995). This Court gives deference to an ALJ's decision "when it 'evinces his [or her] careful, impartial consideration of all the evidence and demonstrates his [or her] sensitivity to the complexity of the issues presented." *County of San Diego v. California Special Educ. Hrg. Off.*, 93 F.3d 1458, 1466 (9th Cir. 1996). As the Ninth Circuit Court of Appeals explained in *Napa Valley*, 496 F.3d at 942-43, a Court "treat[s] a hearing officer's findings as "'thorough and careful' when the officer participates in the questioning of witnesses and writes a decision contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions."

The ALJ's 51-page decision, rendered after a five day hearing, contains a detailed factual background and analysis. The ALJ explains her legal conclusions, including citations to the relevant facts. Additionally, the ALJ was involved actively in the hearing. The ALJ questioned many witnesses, both to clarify responses as well as to elicit follow-up responses. Accordingly, this Court shall give due weight to the ALJ's decision and shall give particular deference to the ALJ's decision to the extent it was "thorough and careful." This Court can "summarily dismiss...impermissible attempts to second-guess the [ALJ's] characterization and weighing of the evidence." *R.B., ex. rel. F.B. v. Napa Valley Unif. Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007) ("*Napa Valley*").

As discussed more fully *infra*, however, the ALJ failed to consider some evidence submitted to this Court, including Dr. Patterson's supplemental declaration. In addition, the ALJ erred to rely on evidence submitted by District, but precluded Student from submitting evidence on that issue. This Court thus defers to the ALJ's well-reasoned and well supported findings and conclusions, but independently reviews the testimony and evidence that the ALJ failed to consider properly. *Napa Valley*, 496 F.3d at 943. "Because IDEA eligibility determinations are fact-intensive," the Court "reviews

18

findings of fact for clear error, even if those findings are based on the administrative record." *Id.* at 937, 943 (quoting *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001)). This Court considers the ALJ's finding of fact clearly erroneous if it "is left with a definite and firm conviction that a mistake has been committed." *Id.*

### Substantive Issues[4]

**1.     Did District fail to assess Student in all areas of suspected disability from June 2005 through June 20, 2007?  Specifically, Student contends that District failed to assess him in the areas of writing, visual-motor integration, working memory, social/emotional, and behavioral.**

As set forth above, the IDEA and California law require District systematically and actively to identify, locate, and assess all children with disabilities or exceptional needs who require special education and related services.  District's child find obligation toward a specific Student is triggered when there is reason to suspect a disability and that special education services may be needed to address that disability.  A student's parent or District may request an initial evaluation to determine whether a child is eligible for special education and related services on the basis of a qualifying disability. 20 U.S.C. §1414(a)(1)(A), (B).  A referral for assessment is appropriate were a pupil has not made adequate progress after an appropriate period of time. 34 C.F.R. §300.309(c).

The initial evaluation must consist of procedures to determine whether a child is a child with a qualifying disability and to determine the educational needs of the child. 20 U.S.C. §1414(a)(1)(C).  In conducting the evaluation, District must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining whether the child is a child with a disability and the contents of an IEP. 20 U.S.C. §1414(b)(2)(A).  District may not use any single assessment as the sole criteria for determining eligibility and must use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors. 20

---

[4]This Court carefully reviewed and considered all arguments, points and authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed by the parties.  Omission of reference to an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the argument, document, objection or paper.  This Court thoroughly reviewed, considered and applied the evidence it deemed admissible, material and appropriate for summary judgment.

1  U.S.C. §1414(b)(2).

2      For purposes of evaluating a child for special education eligibility, District is required to assess

3  the child in all areas of suspected disability. 20 U.S.C. §1414(b)(3)(B); Cal. Ed. Code §56320(f).  A

4  Student shall be referred for special education instruction and services only after the resources of the

5  regular education program have been considered and, where appropriate, utilized. Cal. Ed. Code

6  §560303.  District's failure to assess in all areas of suspected disability may constitute a procedural

7  denial of a FAPE. *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1031-33 (9th Cir. 2006).

8  Procedural violations may constitution a denial of a FAPE if they result in the loss of educational

9  opportunity to the Student or seriously infringe on the parents' opportunity to participate in the IEP

10  process. *W.G. v. Bd. of Trustees of Target Range Sch. Dist.*, 960 F.2d. 1479, 1484 (9th Cir. 1992).  A

11  procedural violation  of the IDEA constitutes a denial of Student's FAPE only if the violation: (1)

12  impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate

13  in the decisionmaking process; or (3) caused a deprivation of educational benefits. 20 U.S.C.

14  §1415(f)(3)(E)(ii); Cal. Ed. Code §56505(f)(2).

15      Student asserts that District failed to assess him in areas of suspected disability, including visual-

16  motor integration, writing, working memory, social/emotional functioning, and behavior.   District

17  contends that it assessed Student in the specific areas of suspected disability when it had reason to

18  suspect that Student had a disability in those areas.  The Court considers each area of suspected disability

19  below separately.

20                                    **Visual-Motor Integration**

21      Student's visual-motor integration ('VMI') skills were assessed by District psychologist, Ms.

22  Anderson in February 2005;  Dr. Glidden, a private psychologist retained by Student's parents, in

23  November 2005; Dr. Aholu, a private occupational therapist, in August 2005 and September 2007; and

24  Dr. Patterson, Student's private psychologist in August 2007. Ms. Anderson assessed Student in the area

25  of VMI as part of her January 2005 assessment.  In her evaluation, Ms. Anderson determined that

26  Student's VMI was below average, as he scored at the 6th percentile on the Visual-Motor Integration

27  Tests.  Ms. Anderson opined that based on this result, Student may present some problems in the

28  classroom with writing, in that he may be unable to write as quickly or neatly.

Dr. Glidden performed two VMI assessments on Student on November 16, 2005.  According to Dr. Glidden's assessments, Student scored in the 36th percentile on the Beery Visual Motor Integration Test (5th edition) ("Beery"), and obtained a standard score of 85 on the Bender Visual-Gestalt Test. Both of these scores were within the average range for children of similar age.  Student's parents shared Dr. Glidden's report with District at the February 28, 2006 student study team.  Based on those results, placing Student in the average range for VMI skills, District correctly determined had no reason to suspect that Student had a disability in that area.

District's determination that there was no reason to suspect Student had a VMI disability is supported by the assessments of Dr. Aholu and Dr. Patterson.  According to Dr. Aholu's August 2005 assessment of Student, using the Beery, Student had a VMI skills level of a 6 year, 11 month old child. Student was seven years and 11 months old at the time of the test.  Although Ms. Aholu noted "concerns" with Student's VMI, she also stated that he was "pretty close to his age level with respect to motor proficiency."  Three months later, however, Student scored in the average range on the Beery performed by Dr. Glidden.  According to Dr. Aholu, Student's VMI was within the "average range" in his September 2007 assessment, although he scored below average in fine motor integration on the Bruiniks Test of Motor Proficiency II.  According to Dr. Patterson, Student's VMI skills are in the average range.  Dr. Patterson further opines that Student does not have a true psycho-motor problem, and that his difficulties are linked to his ADHD.

District occupational therapist, Ms. Dolin also performed VMI assessments on Student in May 2006.  Ms. Dolin performed the Test of Visual-Motor Skills, Revised.  Ms. Dolin testified that Student scored in the average range on this assessment.  Ms. Dolin testified that initially, Student drew different, pointy shapes because he wanted to draw them that way.  Student was allowed to erase the shapes and re-draw them.  Student's results after the erasure were in the average range.  Student correctly points out that Student was allowed to erase and re-draw the shapes in this assessment, in contravention to the standards for that examination.  Student does not explain, however, how the erasures affected Student's VMI score, or how Student's VMI skills were of concern.  When Student did draw the shapes, he did so with average skill.

In addition, other measures demonstrate that VMI was not an area of concern for Student.

Student played on sports teams in school and reported no difficulty in participating in those activities. Student held a pencil properly, and according to Dr. Patterson, pushed the pencil properly. According to Dr. Aholu, Student had a good grasp in writing and had the ability to write appropriately and to hold a pencil appropriately.   When Student wrote slowly, Student's handwriting was good and age appropriate.

Based on the foregoing evidence, District assessed Student in the area of VMI.  District assessed Student in VMI in January 2005, Dr. Glidden conducted an assessment using the Beery and the Bender in November 2005, Dr. Aholu assessed Student's VMI in August 2005 using several instruments, and Ms. Dolin conudcted a VMI assessment in May 2006.   Based on the results of those assessments, District properly concluded that Student did not have a disability based on his average VMI skills. Accordingly, District satisfied its child find obligation in the area of VMI during the relevant time period.

**Writing**

Throughout the applicable time period, Student has had difficulty with written expression and writing.  In his second first grade year, Ms. Anderson attempted to give Ms. Linn strategies to assist Student, because he would "get stuck," need prompting, or simply refuse to write.  Ms. Linn agrees that in her class, Student would freeze when writing, and would refuse to do his work. Ms. Linn explained that Student had difficulty with stretching words and would stop writing when he came to word he could not spell.  Ms. Linn used a student dictionary to assist Student to begin to write and a daily behavior chart.  In October 2005, the Section 504 team considered whether Student had a written language disorder. Ms. Kuipers, Student's second grade teacher, reports similar difficulties.  Student did not want to write in her class.  When he wanted to write, though, he was "probably at grade level."  By this third grade year, Student's written expression was at a minimum.   Mr. Kliewer testified that Student would only work on fill-in-the-blank and fill-in-bubble answers.   Student did not attempt writing assignment and did not turn in writing assignments, with few exceptions.  Mr. Kliewer allowed Student to present orally assignments that other students wrote.  Student told Mr. Kliewer that he did not like writing and did not want to do it.  As part of the 504 plan, Student used the assistive tool Alpha Smart for part of the year in his class.  Mr. Kliewer remembered one assignment that was "beautifully written" about sea

22

animals, but acknowledges that Student wrote the project at home with the help of his parents.

Throughout the administrative proceeding, District relied on one writing sample to demonstrate Student's writing ability. That writing sample, written about Student's favorite Pokemon character, was written at grade level. District, and the ALJ, minimized the fact that this single written sample was achieved through significant efforts. Ms. Weigand, District resource specialist, was unable to get a writing sample from Student when she attempted to do so for her May 2006 assessment. Ms. Weigand attempted to get a writing sample from Student for over one-half hour, and included incentives, including to allow him to write on a topic of his choice. Ms. Weigand testified that although Student enjoyed the topic–a trip to a theme park–he could not write about it. Student was able to express himself orally in an organized and interesting way, but would not pick up the pencil to write his story down. When asked why he wouldn't write, Student repeated to Ms. Weigand, "I'm thinking, I'm thinking." Ms. Weigand sent Student back to his classroom. On a different day, Ms. Bath attempted to get the writing sample from Student. To get Student to write, Ms. Bath gave Student incentives, marked the space for him on the paper, changed the topic, and redirected.

Thus, the only evidence of Student's written expression was been obtained when Student was provided with one-on-one assistance. As described above, Student only wrote the writing sample after a great deal of effort by Ms. Bath, and after Ms. Weigand was unsuccessful. Student only produced written work in Mr. Kliewer's classroom with the personal assistance of District behavioralist, Ms. Wandler. When Ms. Wandler was not personally assisting Student, Mr. Kliewer would send Student to see Ms. Powers in the administrative office. Through incentives and redirection received from Ms. Powers, Student would produce written work sometimes. Student would also write sometimes with the help of his parents. Based on this evidence, and contrary to the ALJ's finding, this Court finds that the substantial weight of the evidence demonstrates that written expression is a suspected area of disability for Student.

The ALJ considered that writing was not an area of suspected need, because Student was progressing. As evidence of Student's academic progress, the ALJ relied on the facts that Student got A's and B's on his report cards and scored in the proficient range for language arts on the STAR examination. This Court finds that based on the clear and undisputed evidence, it was error to place

substantial weight on this evidence.  Student's report card grades were inflated and did not assess Student's written expression.  According to Student's Section 504 plan, Student was only required to complete 50% of all work.  Of that accommodated amount, Student only completed 20-60%.  In total, Student only finished 10%-30% of the assigned work for his grade.  Mr. Kliewer testified that Student's grade was not affected by assignments he did not turn in, and Student did not turn in written assignments.  Therefore, Student's grades do not reflect Student's written expression.  Similarly, the STAR exam does not measure Student's written expression.  Ms. Powers, who is the STAR exam administrator at Maple Creek, testified that students fill-in-the-bubble on the STAR examination, but are not required to write.  Moreover, and as will be discussed more fully below, Student does not take the STAR exam in the regular classroom.  Student takes the STAR examination in the library, with a small group, as an accommodation.

The Court further finds that the ALJ erred to conclude that Student has the ability to write, but chooses not to.  While Student undeniably has behavioral problems, the ALJ, and District, ignored Student's evidence that Student's written expression difficulty may be due to his neurological or physiological disorders as well.  Although Student's teachers testified that Student would write "when he wanted to," they also acknowledged that Student would "freeze up" or "shut down."  Student's expert witness, Dr. Patterson, credibly testified that Student shuts down and is unable to write because of his ADHD.  Dr. Glidden's report suggests that Student's written expression difficulties are due to neurological, as opposed to attitudinal, problems.  Ms. Weigand, who administered the writing sample examination in May 2006, testified that she does not know "what is going on his head" Student refused to write the writing sample.  District's expert witness, Dr. Clare, acknowledged that she is a behavioral psychologist, not a physiologist, and could not speak to the physiological issues that may affect Student.  Dr. Clare never met Student and did not read Student's school record.  Further, Dr. Clare and Ms. Bath opined that Student would write if he enjoyed the topic. Ms. Weigand testified, however, that Student would not, or could not, write on a topic Student enjoyed greatly.  Student's mother testified that at times, Student could not write, even if he wanted to do so.  At best, Student's ability to write was inconsistent and based partly on his behavior.  For these reasons, writing expression was an area of suspected disability for Student, and District's child find obligation was triggered at the beginning of the

relevant time period and continued throughout.

District assessed Student in writing in May 2006; however, such assessment was inaccurate and inadequate. District must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information." 20 U.S.C. §1414(b)(2); 34 C.F.R. §300.304. As explained above, Ms. Weigand was unable to obtain a writing sample from Student, yet District ignored that fact when it concluded that Student's written expression was on grade level. Ms. Weigand also used the Woodcock-Johnson to assess Student. However, Student is only required to fill-in-the-blanks and write simple sentences on the Woodcock-Johnson. As the ALJ found, Ms. Weigand, Ms. Dolin, and Dr. Aholu all had difficulty getting Student to write. In addition, Student's teachers, Student's parents, Ms. Powers, and Ms. Bath all reported that they had difficulty with getting Student to write. The testimony of every witness supported Dr. Patterson's expert opinion that Student is unable to sustain writing effort. Thus, Student's single writing sample does not negate Dr. Patterson's professional opinion, even if he was unaware of it. In evaluating Student's written expression, District ignored the undisputed evidence that Student rarely produced written work in the classroom. The overwhelming and consistent testimony from all witnesses is that Student is impaired in written expression, sustained writing, and the initiation of writing. District did not adequately assess Student in his area of demonstrated need–written expression with stories, paragraphs, initiation of writing and consistency in writing. Accordingly, District failed to assess Student in written expression.

Failure to assess Student in written expression was a procedural violation of the IDEA. A procedural violation of the IDEA constitutes a denial of Student's FAPE only if the violation: (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decisionmaking process; or (3) caused a deprivation of educational benefits. 20 U.S.C. §1415(f)(3)(E)(ii); Cal. Ed. Code §56505(f)(2). It was undisputed that writing is an important skill in education and that to improve in writing, Student must practice this skill. The failure to assess Student in his writing, including determining all aspects of Student's difficulty with written expression, deprived Student of educational benefits. *Target Range*, 960 F.2d. at 1484. Accordingly, District procedurally denied Student a FAPE on this basis.

### Working Memory

District assessed Student's working memory in 2005 and 2006.  Ms. Anderson assessed Student's working memory in February 2005 through the Weschler Intelligence Scale for Children, 4th Ed. ("WISC").  On the WISC, Student received a standard score of 83, which is in the 13th percentile and within the low average range.  Dr. Glidden also performed the WISC in November 2005.  Student received a standard score of 88, which is in the 21st percentile.  District was aware of those results at its February 2006 meeting.  District referred Student for assessment in April 2006, and the assessment plan included assessment in the area of cognitive functioning.  District psychologist Ms. Bath, however, did not conduct additional assessments in the area of working memory.  Instead, Mr. Bath relied on the cognitive testing completed by Ms. Anderson in January 2005 and Dr. Glidden's cognitive tests in November 2005.  Based on her review of those assessments, Ms. Bath provided a psychoeducational report in which she concluded that Student was functioning within the average to high average range of overall cognitive abilities and that he had a relative weakness in working memory.

Because Dr. Glidden's assessment was conducted in November 2005, just six months prior to the April 2006 assessment plan, Ms. Bath did not err to rely on prior assessments.  The ALJ found that Ms. Bath testified credibly that it is considered acceptable for a school psychologist to use an evaluation done previously if that evaluation was done within the previous year as part of as assessment.  Dr. Patterson, in his report, corroborates Ms. Bath's testimony in this regard.  Accordingly, District did not err when it failed to re-assess Student in working memory in its May 2006 assessments.

Based on the foregoing, District did not violate its child find obligation in the area of working memory.  Student's 2005 assessments were in the low average and average range, which does not itself form the basis for a determination of a disability.  This Court agrees with the ALJ that the testimony fails to establish that working memory was an area of suspected disability for Student. Student does not persuade the Court that other evidence, including Student's behavior and difficulties in writing, implicates a working memory disability.  Accordingly, the ALJ did not err to conclude that District had no reason to suspect Student had a disability in the area of working memory and was therefore not

1 obligated to assess Student's working memory during the relevant time period.[5]

2 **Social/Emotional Functioning and Behavior**

3 District identified Student as having social, emotional, and behavioral problems before the

4 applicable time period.  Ms. Anderson assessed Student's social/emotional functioning in January 2005

5 with the BASC.[6]  As a result of that assessment, Ms. Anderson determined that Student was "at risk"

6 for adaptive skills, which includes difficulties with adaptability, social skills, and study skills.  Student

7 was also determined to be in the at-risk range for depression and hyperactivity.  Student was taking

8 medication for his ADHD at that time.  In the classroom, Student was constantly in motion, had

9 difficulty staying on task, and had rapidly fluctuating moods.  Student would have tantrums in the

10 classroom, harmed other students, had trouble with transitions, and failed to complete his work.

11 In October 2005, Student's behavior escalated.  Student exhibited aggressive behaviors toward

12 other children and his work completion was minimal.  Student refused to do his work, and he began

13 hitting, tripping, and throwing things at other children in the classroom and on the playground.  These

14 behaviors triggered District's child find obligation by the end of 2005.

15 When Ms. Bath learned that Student's aggressive behaviors and work completion difficulties

16 were worsening, she met with Student's parents at the February 2006 Section 504 meeting and initiated

17 the referral process for Student to be evaluated.  Ms. Bath called Student's mother after this meeting and

18 expressed her opinion that Student was eligible for special education under the category of "emotional

19 disturbance," based on his social, emotional, and behavior functioning.  Student's parents resisted an

20 emotional disturbance evaluation, because it was their opinion that Student was happy and did not have

21 an emotional disturbance.  After some discussion, Student was referred for assessment in April 2006.

22 Student's claim that he was not assessed in the area of social/emotional functioning is

23 unsupported.  Ms. Bath administered the BASC in May 2006 to assess Student's social and emotional

24 needs.  Student's teachers, Student's mother, and Student all completed BASC rating forms as part of

25

26 [5]Although District did not have the benefit of Dr. Patterson's August 2007 report, Dr. Patterson reports that Student "performing well into the average range" in the area of working memory, based on multiple assessment scores.  This evidence further suggests that working memory was not an area of disability for Student.

27

28 [6]Student has demonstrated that Ms. Anderson's assessment contains many errors; however, Ms. Anderson's assessment is outside the statute of limitations and is not subject to this Court's consideration.

27

the assessment.   Student's teachers rated him in the at-risk range in several areas, including hyperactivity, attention problems, learning problems, social skills, leadership, functional communication, and study skills.   Student's teachers rated him in the clinically significant range in atypicality, withdrawal, and adaptability.   Student's mother, however, placed Student in the average range overall for adaptive behaviors, and only placed him in the at-risk range for hyperactivity, attention problems, and activities of daily living.

In addition, Student's challenges to Ms. Bath's May 2006 assessment are unavailing.   The Court agrees that the time period between the behaviors (October or November 2005) and the assessment plan (April 2006) was excessive.   The evidence established, however, that Student's parents delayed District's suggestions to assess Student in this area.   The ALJ appropriately addressed Student's further challenges to Ms. Bath's assessment, and this Court will not address each challenge here.   This Court agrees with the ALJ that District assessed Student in the area of social/emotional function.[7]

Similarly, District assessed Student in the area of behavior.   Ms. Bath began to address Student's behavior issues since October 2005.   In February 2006, Ms. Bath developed a BSP for Student to address his disciplinary and work completion issues.   In April 2006, the team agreed that Student required assessment in the area of behavior.   As part of her May 2006 assessment, Ms. Bath, a certified behaviorist, conducted a functional assessment of Student's behavior.   Ms. Bath endeavored to assess Student's specific, problem behaviors, to identify the causes of the behaviors, and to provide a roadmap for responses to those behaviors.   Ms. Bath's behavioral assessment focused on Student's behaviors of not following classroom directions, not following individual directions, and off-task behavior.   As part of her assessment, Ms. Bath conducted classroom observations.   Ms. Bath developed a behavior support plan to address these behaviors.   Student's behavior was also assessed as part of the BASC.

At the beginning of the next school year, District made a "behavioral referral" to Ms. Wandler as part of an assessment plan.   Ms. Wandler observed Student in the classroom from October 2006-December 2006, and developed a behavior support plan tailed to Student's needs.   Ms. Wandler then

---

[7]Student's arguments for social/emotional function and behavior are restricted to whether District failed to *assess* Student in this area.   Accordingly, this Court does not consider whether District erred to conclude that Student did not qualify for special education based on his social/emotional function or behavior.

implemented the BSP directly in the classroom from February through April 2007.  Accordingly, District

assessed Student in the are of behavior.

**2.      Did District deny Student a free appropriate public education by failing to find him eligible for special education and related services under the category of specific learning disability (SLD) or other health impairment (OHI) from June 20, 2005 through June 20, 2007?**

Student is eligible for special education and related services if he is a "child with a disability"

and who, by reason thereof, needs special education and related services, and whose impairment requires

instruction, services, or both, that cannot be provided with modification of the regular school program.

20 U.S.C. §1401(3)(A); 34 C.F.R. §300.8(a)(1); Cal. Ed. Code §§56026(a),(b).  A child is not considered

a "child with a disability" if it is determined that a child only needs a "related service" and not special

education. 34 C.F.R. §300.8(a)(2)(i).

If District failed to identify Student as eligible for special education, and therefore failed to

develop an appropriate IEP for Student, District has denied Student a FAPE. *Dept. of Educ. v. Cari Rae*

*S.*, 158 F. Supp. 2d 1190, 1196-97 (D. Haw. 2001).  This Court has the authority to determine whether

a Student is eligible for special education and related services under the IDEA. *Hacienda La Puente Uni.*

*Sch. Dist. v. Honig*, 976 F.2d 487, 492-93 (9th Cir. 1992).

Student argues that District denied him a FAPE, in violation of the IDEA, by failing to find him

eligible for special education and related services.  Student offers two grounds under which he should

be categorized as a child with a disability pursuant to 20 U.S.C. §1401(3), and is therefore entitled to

special education.  First, Student asserts that he has a "specific learning disability" ("SLD") because he

has attention deficit disorder and processing speed disorders, and exhibits a severe discrepancy between

his achievement and intellectual ability.  Second, Student asserts that he has "other health impairments"

("OHI"), pursuant to 20 U.S.C. §1401(3)(A), because he has ADHD that interferes with his ability to

complete schoolwork.  Student argues that by reason of either his SLD or OHI, he needs special

education and related services, which District failed to provide.  The Court considers each below,

beginning with OHI.

### OHI

Student is eligible for special education and related services pursuant to the IDEA if he has an

"other health impairment" and "by reason thereof [needs] special education and related services." 20

29

U.S.C. §1401(3)(A).  "Other health impairment" means "having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in a limited alertness with respect to the educational environment, that...[i]s due to chronic or acute health problems such as...attention deficit disorder or attention deficit hyperactivity disorder...and adversely affects a child's educational performance." 34 C.F.R. §300.8(c)(9); *see also*, Cal. Ed. Code §56339; Cal. Code. Regs. Tit. 5 §3030(f).

The ALJ concluded, and this Court agrees, that Student has limited alertness due to his ADHD and Student's educational performance is adversely impacted by his ADHD.  Student undisputedly has ADHD.  He also has a psychological processing disorder, a speed processing disorder, and oppositional disorder.  Student's ADHD and accompanying disorders affect his behavior.  He has trouble focusing, staying on-task, transitioning between tasks.  Student also had difficulty with task initiation.  The ALJ found that Dr. Patterson testified credibly that Student's inability to attend and sustain writing as a result of 'waxing and waning of attention' and distractibility and impulsivity is adversely affecting his educational performance.  The ALJ further found credible Dr. Patterson's opinion that "the lost time from the classroom because of behaviors likened to the disorder appear to have clearly impacted his educational progress."  The ALJ also found that Dr. Patterson's opinion that "Student will eventually fall behind his pears" and that "Student's educational performance is adversely affected by virtue of the fact that he is not writing in class because he is losing opportunities to practice and District expert, Dr. Clare, testified that Student must practice in writing is necessary for improvement.

This Court disagrees with the ALJ's conclusion, however, that Student does not require special education because he is progressing academically in the general education classroom.  The ALJ found that Student can access his education through regular or categorical services offered within the regular instructional program, based on the fact that Student never received a grade of less than a C on a report card, performed at or above grade level in the areas of mathematics, reading, and writing according to District assessments, and his STAR results were proficient or advanced.

The ALJ applied the *Rowley* "benefit" standard to consider whether Student is receiving some educational benefit from the general classroom. *Hood v. Encinitas Union Sch. Dist*., 486 F.3d 1099, 1107 (9th Cir. 2007).  In *Rowley*, the Court determined "academic progress, when considered with the special services and professional consideration accorded by the...school administrators, to be

dispositive," but noted that a Student may not be benefitting from a general education even if that student is advancing from grade to grade. *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 203 n.25 (1982). This Court recalls that to determine eligibility, District shall review "existing evaluation data," including evaluations provided by the parent of the child; current classroom-based assessments and observations; and observations by teachers and related service providers." 34 C.F.R. §300.533(a). "[O]n the basis of that review, and input from the child's parents," District then determines "whether the child has a particular category of disability." *Id*.

As discussed more fully above, this Court finds that Student is not making academic progress in the area of written expression. Student's inflated grades and test scores are an inaccurate assessment of Student's achievement, as they are the result of accommodations. Dr. Patterson and Ms. Bath both testified that writing is an important skill and Student must practice writing to improve. Yet District's accommodations allow Student to write less and do not provide any repetitive type written work through a special education program. Moreover, as Ms. Wandler points out, Student was not maintaining an appropriate grade level work load. In addition, the ALJ precluded Student from questioning District witnesses about those accommodations and their results. Accordingly, these results are not conclusive in the determination of whether Student requires special education and related services.

This Court finds credible Dr. Patterson's opinion regarding Student's eligibility for special education based on OHI. Dr. Patterson is a psychologist who has worked as a school counselor, administrator, assistant principal, director of special education, and school psychologist. Dr. Patterson teaches assessment classes at Chapman University. Dr. Patterson met with Student and assessed him over the period of one day. Dr. Patterson read through Student's cumulative file and is familiar with all past assessment results, Section 504 meeting discussions and results, and IEP meeting discussions and results. Dr. Patterson further met with Student's parents and discussed their on-going concerns and the basis thereof. Dr. Patterson based his opinion on his own observation, assessments, experience and expertise, taking into account input from the parents, Student's teachers, and medical doctors.

Dr. Patterson testified that Student needs to be in a restricted setting for at least part of the day in a resource program, or he needs to be in a special day class. This opinion is shared by Dr. Glidden, who opined nearly two years earlier, in October 2005, that Student must have individual instruction or

instruction in small groups. Both opinions are credible. District employees have also recommended modifications to Student's educational setting. Ms. Weigand suggested that Student may require a "structured classroom." Ms. Anderson and Ms. Bath also suspected Student of a disability based on his emotional and behavioral problems, and suggested eligibility for special education. Student's teachers, parents, and administrators acknowledge that Student needs a "quiet space" and must be removed from the classroom to focus to help with his behavior and work completion problems.

Dr. Clare, District's expert witness, did not negate Dr. Patterson's opinion. Dr. Clare admitted that she did not meet Student or Student's parents. Dr. Clare did not review Student's school file. Dr. Clare's opinions were limited to a review of Dr. Patterson's report. In addition, Dr. Clare testimony was not conclusive. Dr. Clare correctly testified that it takes a team, not just one person, to make an eligibility determination and she acknowledged that her opinions are based solely on a psychological evaluation. Dr. Clare credibly testified that it is paramount to consider all aspects of a Student's case, including classroom observations, teacher interviews, interviews with the Student and the Student's parents, when making an eligibility determination.

This Court disagrees with the ALJ that Student is able to progress with reasonable accommodations and the BSP provided through Student's section 504 plan. District's attempt to address Student's difficulties with Section 504 plans and behavior support plans in the regular classroom have had limited success. District has provided multiple strategies to assist Student and Student's teachers, but Student's difficulties continue. The evidence shows Student's behavior problems escalated, even with a BSP in place, and only improved when he had Ms. Wandler in the classroom or when Student was removed from the classroom. Once Ms. Wandler left the classroom, Student's aggressive behaviors returned and continue. Student further continues to exhibit difficulty with work completion and written expression. Student's parents and teachers need help with Student and continue to struggle with him and with providing him access to education. Pursuant to Student's Section 504 plans, for multiple school years, Student is sent outside of the classroom–to either a resource specialist or an administrator. Dr. Patterson credibly testified that Student is falling behind because of Student's repeated absences in the classroom and that this increase. Thus, the Section 504 plan may result in a loss of educational benefit to Student.

Importantly, the Section 504 plans and BSPs do not address Student's unique needs.  Student provided evidence, through Dr. Glidden's report, that Student's problems with writing, attention, and work completion are physiological and neurological in nature.  District's evidence, witnesses, Section 504 plans, and BSPs seek to address Student's behavioral issues, but do not address the physiological and neurological nature of Student's disorder, and its manifestations.

For these reasons, this action is distinguished from *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099 (9th Cir. 2007), the case upon which the ALJ relied.  In *Hood*, the student's Section 504 accommodation plan was only in place for a short period of time, and it was difficult for the Court "to judge its success at meeting [Student's] unique needs."  *Id*. at 1108.  In addition, the Court found that the accommodations in the Section 504 plan were directly tailored to address the Student's weaknesses.  *Id*. at 1109.  Moreover, the student performed well in all academic areas.  By contrast, the clear weight of the evidence persuades this Court that after multiple years, the Section 504 plans have been unsuccessful and do not address all of Student's needs.

Student's only demonstrated successes are when Student has special education and services.  Student was on task more often, and his aggressive behaviors subsided, only when he was removed from the classroom or had the assistance of a one-on-one behavioralist in the classroom.  Student's success in written expression depended on his removal from the classroom, to a "quiet place," to the office, or to his home, with individualized attention and redirection.  Student is successful in STAR testing because he is not required to write, and has alternative testing accommodations of restricted size of the group and in the library, outside of the regular classroom.

District erroneously continued to provide a Section 504 plan rather than develop an IEP to provide a FAPE tailored to Student's unique needs. "Both section 504 and IDEA have been interpreted as requiring states to provide a free appropriate public education to qualified handicapped persons, but only IDEA requires development of an IEP and specifically provides for transition services to assist students [to] prepare for a post-high school environment. See 20 U.S.C. § 1401(a)(20). Under the statutory scheme, the school district is not free to choose which statute it prefers." *Yankton School District v. Schramm*, 93 F.3d 1369, 1376 (8th Cir. 1996). "The District should have devised an IEP to meet [the student's] unique needs in compliance with the provisions of the IDEA, and its proposed plan

under § 504 of the Rehabilitation Act was not an adequate substitute." *Muller ex rel. Muller v. Committee on Special Educ.*, 145 F.3d 95, 105 (2d Cir. 1998); *Moser v. Bret Harte Union Sch. Dist.*, 366 F. Supp. 2d 944, 971 (E.D. Cal. 2005).

For the foregoing reasons, this Court finds that Student has proven that he needs special education and related services, and his impairment requires instruction, services, or both, that cannot be provided with modification of the regular school program. 20 U.S.C. §1401(3)(A); 34 C.F.R. §300.8(a)(1); Cal. Ed. Code §§56026(a), (b).  Student has limited alertness due to his ADHD and Student's educational performance is adversely impacted by his ADHD.  In addition, Student's OHI affects his writing abilities, which are lagging behind his peers and must be addressed through special education and related services.  District's failure to identify Student as eligible for special education, and failure to develop an appropriate IEP for Student, denied Student a FAPE. *Dept. of Educ. v. Cari Rae S.*, 158 F. Supp. 2d 1190, 1196-97 (D. Haw. 2001).

## SLD

The definition of an SLD student changed during the relevant time period.  Through June 30, 2005, California Ed. Code 56337 defined "specific learning disability" as follows:

> A pupil shall be assessed as having a specific learning disability which makes him or her eligible for special education and related services when it is determined that all the following exist:
>
> (a)  A severe discrepancy exists between the intellectual ability and the achievements in one or more of the following academic areas:
> (1) Oral expression;
> (2) Learning comprehension.
> (3) Written expression.
> (4) Basic reading skills.
> (5) Reading comprehension.
> (6) Mathematics calculation.
> (7) Mathematics reasoning.
>
> (b) The discrepancy is due to a disorder in one or more of the basic psychological processes and is not the result of environmental, cultural, or economic disadvantages.
>
> (c) The discrepancy cannot be corrected through other regular or categorical services offered within the regular instructional program.

On July 1, 2005, the IDEA was amended to read that a school district "*shall not be required* to take into consideration whether a child with a severe discrepancy between achievement and intellectual ability...in

written expression." 20 U.S.C. §1414(b)(6)(A) (emphasis added).  The California Education Code was revised to mimic this change. Cal. Ed. Code §56337(b).  The IDEA specifies that an SLD "does not include a learning problem that is primarily the result of visual, hearing, or motor disabilities, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage." 20 U.S.C. §1401(30).

District was no longer required to consider whether there was a severe discrepancy between his intellectual ability and achievements.  Student correctly argues that District may consider whether there was a discrepancy.  Nevertheless, Student does not persuade this Court that the ALJ erred to determine that there was no severe discrepancy between Student's intellectual ability and his performance.  Accordingly, the ALJ's ruling that Student was not eligible for special education based on SLD  was not clearly erroneous.

**Remedies**

This Court finds that District failed to assess Student in the area of writing and failed to identify Student as eligible for special education and related services under the category of OHI.  As such, District violated the IDEA.  This Court shall remand this action to the ALJ to consider in the first instance what remedies are appropriate to address these IDEA violations, consistent with this opinion.

**CONCLUSION AND ORDER**

For the foregoing reasons, this Court:

1.      GRANTS in part Student's motion for summary judgment, to the extent that this Court finds that District failed to assess Student properly in the area of writing, and failed to provide Student a FAPE based its failure to identify his as eligible for special education under the category of OHI;

2.      GRANTS in part District's motion for summary judgment, to the extent that this Court finds that District assessed Student in the areas of VMI, working memory, social/emotional functioning/ and behavior, and did not commit clear error to determine that Student was ineligible for special education and related services under the category of SLD;

3.      DENIES the parties summary judgment motions in all other respects;

4.      REMANDS this action to the ALJ to make a further determination on appropriate remedies;

5.      ORDERS the parties, **no later than June 17, 2009**, to submit a statement regarding which party shall retrieve the administrative record.  If no party indicates a willingness to retrieve it by June 17, 2009, this Court shall destroy the administrative record; and

6.      ORDERS the parties, **no later than June 17, 2009**, to submit a joint proposed judgment to this Court.

IT IS SO ORDERED.

**Dated:**      **June 8, 2009**                                        **/s/ Lawrence J. O'Neill**
                                                                        UNITED STATES DISTRICT JUDGE